[Respublica *v.* Guardians of the Poor of the City of Philadelphia.]

ship, 1 Stra. 704, and maintenance of the poor *per saltum*, Comb. 321, and cases of warrants of distress for poor rates, Comb. 342, 1 Lord Raym. 42, have all been determined merely on the footing of usage. The interests of the community were involved in the present measure, and it was hoped that the court would interpose therein.

Mr. Rawle *è contrâ* for the guardians, denied, that either the act of 1782, or that of 27th March 1789, (2 Dall. St. Laws, 685,) *restrained them to the appointment of any of [*477 the old members; but the legislature had left it in their discretion to appoint any six of their own number. He denied the extent of the usage asserted on the other side.

*Per curiam.* The practice was certainly a good one, to leave in three of the old managers on a new appointment, and tended to train up new members to a ready discharge of their offices. But the legislature have not thought proper to put the guardians under this restriction; the appointment is left to their discretion, and one half of the overseers are succeeded by others every six months. We should go too far in saying that the late election has been defective and illegal. The legislature only can give a full and complete remedy, and through them application for redress must be sought, if inconveniences arise from appointments similar to the present.

Motion overruled.

# Charles Pulaski *against* Ezekiel King.

A mortgage payable by instalments, all of which become due within seven years next after an inquisition taken, must be taken into consideration by the jurors.

MOTION to set aside an inquisition.

The defendant had executed a mortgage to the plaintiff for 3666 dollars and 67 cents, payable by instalments, the last whereof would not become due until the month of July next. Bonds had accompained it, on one of which judgment had been entered, and a *fi. fa.* issued for 2000 dollars and interest from 1st July 1794. The jury in estimating the rents and profits, took the judgment only into consideration. They refused to consider the mortgage, all the periods of payment not being past, and therefore did not condemn the house and lot seized and taken in execution by the sheriff.

The court set aside the inquisition. They declared that all the instalments becoming due within the seven years next after the jurors holding the inquisition, ought to have been regarded by the jury when they formed their judgment. The term "reprizes," in the act of assembly of 4 Annæ, (Prov. Laws. 50,) clearly include mortgages.

[Pulaski *v.* King.]

Mr. Hallowell, *pro quer.*    Mr. Wells, *pro def.*

Explained in 3 P. & W., 477.
Cited to show that if a judgment is not restrained for more than seven years by stay of execution, or a mortgage is due and payable within four years, they both come within the meaning of the term reprises.

And his counsel contended, that no evidence having been given to evince an actual larceny of the stallion, the plaintiff was divested of his property, by the transaction in the horse market.

They argued, that at common law, a sale in market overt by a party who had no property, shall bind the right of the true owner.    Kely. 35.    And a sale of stolen goods in a place where such articles are usually and publickly sold, will divest the true right.    Moor. 360.    The true owner of goods does not lose his property unless by a sale in a market overt.    3 Atky. 49, 51.    Trover will not lie after a change of property by a transfer in market overt.    2 Espin. 337, 338.

A distinction has been created by positive British acts of parliament, between the sales of horses and other personal property.    Before the statutes of 2 Ph. and Mar. c. 7, and 31 Eliz. c. 12, the sales of stolen horses in market overt were conclusive on the former proprietors.    But those laws afterwards pointed out particular directions which were to be pursued, and if not fully complied with, such vendees acquired no property.    2 Bl. Com. 449, 450, 457.

Under the 7th section of the act of assembly passed 23d September 1780 (made perpetual by an act of 9th December 1783,) "no sale of any stolen horse by virtue of this act shall "be deemed a public sale in market overt, so as to change "the property thereof."    1 State Laws 409.    And from hence

they inferred, that previous to the passing of that act, there were markets overt in Pennsylvania, and that the sale of a horse not stolen, in market overt, changed the property.

For the plaintiff, it was insisted, that the universal opinion re*ceived at the bar, was, that there were no markets [*479 overt in Pennsylvania. The expressions quoted from the law of September 1780, may be fairly supposed to have arisen *ex abundanti cautelâ* of the legislature, that no false notions should be entertained of a sale at public auction passing the property of a stolen horse, and repel all ideas of such auctions being deemed markets overt.

The policy of markets overt, as a commercial regulation, may well be doubted. A variety of judicial decisions have however established the point, that no such markets ever existed amongst us. Among others, in Thomas v. Hess in replevin, determined by Mr. President Shippen, in the Common Pleas of Philadelphia county, it was clearly resolved, that where a feather bed had been sent from Chester county to a friend in the city, who had betrayed his trust, by selling it at public vendue, and an innocent purchaser had fairly bought it, and paid his money, the original owner should recover. It is not pretended in mercantile life amongst us, that a sale in any store in the city will change the property, unless the vendor had a title, and there is much less reason in, and greater public inconveniences result from the position, that a sale in a horse market shall divest a right to a horse stolen by villainy, or lost by casualty.

The court gave in charge to the jury, that the credibility of the witnesses, who asserted the plaintiff's property, lay solely with them. If they had no good reason to disbelieve them, the verdict should be for the plaintiff, with such damages as they believed that he had really sustained. In England, sales in fairs or markets overt, were held to be binding on all those who had property in the articles sold, except in the cases of stolen horses, which were subjected to the regulations of the statutes of 2 Phil. and Mar. and 31 Eliz. 2 Bl. Com. 449. This efficacy of markets overt arose from prescription, and was part of the antient common law. But in this government, we have no such antient law or custom. On the contrary, the uniform determinations of courts of justice have have rejected such an usage, whenever it has been relied on, and great inconveniences would arise from adopting it. We think these resolutions founded in honesty, and the soundest and best policy. In the language of Sir John Kelyng, "they "tend to the advancement of justice, to make men prosecute "felons, and they will discourage persons from buying stolen "goods, though in a market overt; for under that pretence, "men buy goods there for a small value of persons whom "they have reason to suspect, which practice these resolutions "will abate." Kely. 48.

[Hosack *v.* Weaver.]

*480]    *The jury were of the same opinion, and found a ver-
dict for the plaintiff with 60l. damages and 6d. costs.

Mr. Tilghman, *pro quer.*

Messrs. Moylan and S. Levy, *pro def.*

Cited in 5 S. & R., 130; 8 S. & R., 501; 9 S. & R., 338; 4 Rawle, 290; 6 Wh., 422; 11 Pa., 385, to show that the doctrine of market overt does not exist in Pennylvania.